The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, are parties having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Mr. Katske. May it please the Court. I'm Richard Katske from Duke Law School. Arguing this morning will be my student, Josh Britt, joined at council table by student Jake Sherman, and a couple of my other students are also here as well. Thank you for the opportunity, Your Honor. Thank you. Welcome. Mr. Britt, when you're ready. May it please the Court. Youngberg affords deference to health care providers on the presumption that they're acting in their patient's best interest. That wasn't the case here. Despite not needing to allege medical standards to show that the abuse here was grossly improper, Mr. Riddick provided the Virginia regulations as a guidepost to accepted medical practice. Just like Virginia, federal and state regulations nationwide show that Vaughter's abuse was miles outside reasonable medical practice. And Vaughter could not have abused Mr. Riddick without Barber's blessing. As appointed counsel could have explained, under any pleading standard, especially the liberal construction afforded to civil rights pro se complainants, that was enough to state a claim against both Vaughter and Barber. Starting with professional judgment, as the United States correctly explains, Mr. Riddick did not need to expressly identify a medical standard in order to plausibly state a Youngberg claim. But even if that's not right, Mr. Riddick referenced and attached numerous Virginia regulations to give the district court a guidepost for determining accepted medical practice. While that was not the source of his claim, that's the 14th Amendment, Mr. Riddick provided a zone of accepted medical practice with the Virginia regulations so that the district court could adequately determine whether or not he plausibly stated a claim. But the district court took that as a procedural due process claim and made sure that Mr. Riddick had traced every possible outcome in the Virginia regulations to determine whether or not he had stated a claim. That's not how we view substantive due process claims, especially not Youngberg ones. Now, in addition to the Virginia regulations, every state in this circuit has promulgated a regulatory scheme that calls for iterative check-ins when an individual is restrained or secluded for longer than, at the most, 24 hours. That didn't happen here. Mr. Riddick was placed in restraints for 14 to 16 days straight, and after that, he was moved to seclusion for 577. Not once does Mr. Riddick say in his pleadings that he was checked in on, and if it was, it was through a two-way mirror where he could not interact with the individual on the other side. Additionally, the regs have to be — the regulations reflect nationwide norms. Every state in this circuit agrees with Virginia, and just like other areas of the law where the court tries to determine accepted professional norms, such as ineffective assistance of counsel, this court can look to those regulations to make a determination about the general zone of accepted practice, and here find that Mr. Riddick plausibly stated a claim. Can I ask you a question, counsel? The district court, as I understood it, said, you know, these regulations don't do the trick because of the exemption, and that there was no allegation that it was a violation of professional standards to seek the exemption. Do you disagree with that conclusion, that it was not a violation of accepted standards to seek an exemption, or do you think that's the wrong question? Two points in response, Judge Harris. The first, it is not always going to be unacceptable or a substantial departure from accepted practice to seek an exemption. However, the exemption sought and the exemption granted by both Votter and Barber was a substantial departure from accepted practice. The second point, Judge Harris. Can I just pause on that for a minute? Is it your understanding that the exemption sought was for 19 months of solitary confinement? Based on Mr. Riddick's pleadings, yes. Votter tells him that he could be secluded or restrained indefinitely. She says that she's able to do that at any time, and she says that in letters in which she has already stated that she sought an exemption and received one. So my understanding of the record, as Mr. Riddick put it, is that the exemption sought and granted was not time limited. The second point that you asked about, Judge Harris, was about whether or not this was the correct question. I don't think it is. A Youngberg claim cannot be predicated on one instance in time when the individuals decide to go with a course of treatment. It has to be predicated on the total course of treatment. And here, the 591 days, that length, that's the correct question for the court to be asking about. Not whether or not at the very beginning of the restraint and seclusion it was proper to seek any kind of exemption, but rather whether the course of treatment as a whole was a substantial departure from accepted practice. But it seemed like the district court felt that the exemption was the permission to part from what would normally be the standard. And that became part of the standard. And as you said, it was open-ended. The district court seemed to think that you had to show, not you, your client, of course, had to show that there was something wrong about that conduct, allowing the exemption to go that far. Because the exemption is permitted, as you have to concede. And the exemption does not give a time limit to it. And this one didn't either. So how on the face of it, I think the question becomes, did you show that that is a matter of fact, that it just shocks the consciousness, the conscience, that having that open-ended? Or what does that stand on the young bird that we have to look at? So I think three points in response, Judge Gregory. The first is that 10D does say that an exemption needs to be time-limited. Mr. Riddick alleges that it was not. And so that on its face would be an invalid exemption. And therefore, the exemption, granted the exemption itself, would have been a substantial departure from accepted practice. But even if I'm wrong about that, I want to return to the court to what the point of the Virginia regulations is. The point of the Virginia regulations in this case is not to determine whether or not at every stage the physicians were acting in accordance, or the health care providers, excuse me, were acting in accordance with the regulations, but rather they are simply a guidepost for the court to later determine at a later stage what accepted practice would be and whether or not there would be a substantial departure. This is just whether or not Mr. Riddick plausibly stated a claim and whether or not the exemption was time-limited or it was not, or it was, which we assert based on the record it was not time-limited. Regardless of that, the Virginia regulations can still give the court a plausible acceptable practice zone to make a determination about this case. And the district court didn't see it that way. The district court said we have to trace every single understanding of what could have happened under the regulations and whether or not every step was incorrect or correct. The third thing I want to address, Judge Gregory, was your question. Let me ask you a question before you get to that. If we agree with you and appoint counsel, is the appointed counsel stuck with the pro se plaintiff's draft of his complaint or should he be given leave to amend? And if he's given leave to amend, that overcomes the pleading problem if he does a good job, right? That's correct, Judge Faber. If he is allowed to leave to amend, that would hopefully solve the issue with the pleadings that we're in front of this court today to discuss. And should you choose to do that, I'm sure Mr. Riddick would welcome that relief. However, appointed counsel would additionally have been able to respond to Defendant Apelli's motion to dismiss in a way that was adequate to keep this case going forward. And so it's not just based on the pleadings. It's also based on the entirety of the legal services that Mr. Riddick should have been afforded. I want to return to Judge Gregory's question about the shocks to conscience test. Everybody on the panel in Doe 4, including Judge Wilkinson in dissent, agreed that if something shocks the conscience, then it's a substantial departure from accepted practice. So that's from this court. And here, this was a situation that shocked the conscience. For 19 months, Mr. Riddick was thrown in seclusion and not allowed to see anyone except through a – well, not allowed to see anyone. People might have been able to see him. There's nothing in the record stating that people actually did via a two-way mirror. Additionally, Mr. Riddick was placed in the care of Virginia in order to treat his health care – or his mental health issues. And Mr. Riddick alleges that the only thing that came from this kind of treatment was that he was deteriorating rapidly. He was unable to eat. He was unable – he began to hallucinate. He began speaking to himself. And in addition to that, he was unable to attend religious services. Counsel, I'm sorry. I just want to go back to his mental health deterioration. Is it your position that that is sort of an additional allegation from which it can be inferred that this course of treatment was outside professional judgment? Yes, Judge Harris, that would be another ground that this would be a substantial departure from accepted practice. And it also goes to the question of even if the two health care providers here did, in some narrow legal sense, comply with the Virginia regulations, that doesn't matter because Mr. Riddick was entrusted into the care of the state of Virginia to be treated, not to be abused. Quickly, on personal participation, if I may, Gordon B. Schilling, cited on page 31 of our opening, holds that Barber's counterpart at the Virginia Department of Corrections could be held liable for deciding medical grievance appeals resulting in Eighth Amendment violations. That case is instructive here. There, the defendant reviewed policy and acted as a judge to affirm or deny medical grievance appeals in a sort of third-party neutral sense. Here, Barber's involvement goes further. His carte blanche to Votter was the only way that she was able to abuse Mr. Riddick the way that she did. Briefly, returning to Judge Faber and appointment of counsel, Mr. Riddick pled this strong claim while he was committed to an institution that this court has already recognized does not provide adequate legal resources and while staff were depriving him of the scant research that he was able to conduct that he had on his USB. Those were extraordinary circumstances that warranted appointment of counsel then and certainly warrant it on remand. If there are no further questions, Your Honors, I see my time is about to expire. Thank you. Thank you, Mr. Brigg. Mr. Backer. Thank you, Your Honors, and may it please the Court, Jonathan Backer for the United States' amicus. I want to pick up on a couple of questions that Your Honors have asked, starting with what the standard is. I agree with counsel for the plaintiffs that if that shocks the conscience, a fortiori has to violate Youngberg. But I think Doe 4 sets forth some contours on what the standard here is. We know that from Youngberg that the standard is more protective than the Eighth Amendment deliberate indifference standard. And so this Court said in Doe 4 that it's something beneath deliberate indifference, something that's above negligence, somewhere in that zone. And here I fully agree with plaintiff's counsel that the regulations provide a helpful heuristic to show what the zone of acceptable professional practice is regarding restraint and seclusion in the civil commitment context. But there are many other allegations in the complaint from which a plausible Youngberg claim can be inferred. So page 93 of the joint appendix shows that Ms. Barker, one of the workers at the hospital who's responsible for helping patients advocate for their rights, she questioned Mr. Riddick being in restraints, and then she was told that there was an exemption. But she was concerned about the practices that were going on at the hospital with respect to Mr. Riddick. Then at page 92 of the joint appendix, we see that the hospital justified Mr. Riddick's restraints and seclusion based on a concern that he might become aggressive in the future. So that's not a tailoring based on something that imminent aggression, but instead a prediction about what might happen in the future. Judge Harris, you mentioned the deteriorating health. Yes, that is another allegation that helped show that professional judgment wasn't being calibrated to the situation on the ground as Mr. Riddick was in seclusion for 577 days. And that's another thing. It's not just that there was some sort of de minimis difference between the regulations and what Mr. Riddick experienced. We're talking about restraint and seclusion, orders of magnitude greater than the presumptive maximum set forth in Virginia's regulations. And yes, there was an exemption, but of course the 14th Amendment and Youngberg are a constitutional floor from which State law can't deviate. And here we have, again, orders of magnitude different. If Virginia had no regulations whatsoever on this issue, then still Youngberg would be the floor and the backstop to unconstitutional conditions of confinement in the civil commitment context. Another allegation at issue here is that, you know, that Mr. Youngberg alleged that he was being restrained and secluded based on a standing order. So that's another factor that says that Mr. Riddick wasn't — didn't have the tailoring necessary to ensure that professional judgment was being exercised throughout this entire year-and-a-half-plus course of conduct. If Your Honors have no further questions, then the United States would request that Riddick's claims — that the district court's judgment be reversed and that Mr. Riddick have an opportunity to proceed to discovery in trial court. Thank you, Mr. Becker. Mr. Fisher. Good morning, Your Honors. Scott Fisher from Harmon Clear here in Richmond. I'm pleased to be here today on behalf of Defendant Appellees Jack Barber and Rebecca Vaughter. Mr. Barber is the former interim commissioner of the Department of Behavioral Health and Developmental Services, and Ms. Vaughter, Dr. Vaughter, is the former director of Central State Hospital. Central State Hospital is where Mr. Riddick has been involuntarily committed after being found not guilty by reason of insanity for three counts of capital murder. And during his stay there, he was convicted of maliciously wounding a Central State staff member. Now, the 14th Amendment does have a — does provide a due process right of involuntarily committed patients in state mental health facilities to have reasonable care and safety in reasonably nonrestrictive confinement conditions. That's from Youngberg. But those interests are not absolute, and the state may restrain residents in mental health institutions when and to the extent professional judgment deems necessary. And Youngberg says that decisions made by professionals are presumptively valid. Now, dealing with Barber first, because I think that that's an easier case, Barber was the head of an agency. And the only thing that we can infer from the limited allegations in the second minute complaint is that Barber approved an exemption. That exemption is permitted by the regulations, as everyone here has conceded. There are no allegations of personal involvement on Barber in terms of whether or not he knew what was happening at Central State, the circumstances of the restraint, the circumstances of the seclusion, the conditions that Riddick alleges he faced during those times. Rather, Barber just granted an exemption, which is a permissive act that gives a tool available to Central State staff members to then use their discretion. And so unlike the Schilling case, which plaintiff relies on, there is no personal involvement. In Schilling, the Gordon V. Schilling case, I want to point this out, it involved the standards for how hepatitis C would be treated. And the chief physician, he had guidelines for when they would get certain drugs. And those guidelines were revoked. And he knew that revoking those guidelines would result in there not being any treatment for hepatitis C. Now, there were many reasons in that in the record, because there's an evolving treatment standard for that. But in any event, he knew that treatment would be withdrawn because of his guidelines being withdrawn. Counsel, I understand what you're saying. And I could imagine that after discovery in this case, it would become clear that Mr. Barber didn't know what form the alleged exemption would take. But I don't understand how we know that now. Your colleague on the other side says that the fairest reading of the face of this complaint is that he knew he was authorizing either an indefinite period of seclusion and, I guess, or restraint, or a 19-month period of seclusion. And if that's the form the exemption took, how is he not personally involved in this? Well, I think that overstates the exemption. And if you look at Joint Appendix 92, which counsel has referenced, this is a letter from February 2nd, 2018, from Dr. Vaughter to Mr. Riddick. And at the end of the second paragraph, and I'll just read it for the record, these exemptions shall be time-limited and services shall not be compromised. Based on the exemption, you could be placed in seclusion or restraint any time there is a concern that you could become aggressive without needing to meet criteria outlined in policy. The inference from that is Barber is giving them permission at Central State to use restraints and seclusion any time there is a concern, not indefinitely, not whenever you want to. That is an inference one could draw, but I'm not sure that it's compelled that this letter attached to the complaint makes this issue clear. I mean, I don't want to bother you too much on this. I do understand your argument. Sure, and I understand the Court's concerns about whether or not at the pleading stage the allegations were sufficient. I just think with respect to Barber in particular, the only allegation really is that per Barber, he was indefinitely restrained in four-point restraints, and that's belied by the record in the complaint. But I'll move on. As it relates to Dr. Vaughter, I think that there is plenty in the record to show that professional judgment was, in fact, used. Again, this February's — I'm sorry. I apologize for interrupting. There's just one thing I really want to get clear. So, again, your colleagues on the other side say that it is not required at the pleading stage to plead the content of the professional judgment standard that's being violated. And as I understand your brief, you don't disagree. Your brief says that colleagues fault the district court for requiring that he identify the relevant accepted professional standard, but the district court didn't do that. So you're not actually — what is your position on whether or not it was required that Mr. Riddick identify the relevant accepted professional standard at the pleading stage? Thank you, Judge Harris. I don't think he had to do that. However, however, what's notable from the Second Amendment complaint is he does not allege that the use of restraints was unjustified. He does not allege that the use of seclusion was unjustified. He does not allege that the exemption sought and granted was unjustified. And so that's — So you think we can affirm it on an alternative ground? I think so, Your Honor. And I don't think it's terribly hard to state a claim at the pleading stage. I would expect that you would see things like Mr. Riddick saying, I'm a model citizen, I pose no threat of harm to myself or others, I'm following all my treatment plans, and then they've put me in restraints for no good reason. Doesn't he say more or less that in the — in the Vaughtner letter that's attached, that, you know, you say you're not doing anything wrong, you're not being aggressive, you're not being violent, but you could become violent, and so that's why this is justified? I don't think that's clear from that, and perhaps that's what he would try to allege if he had another opportunity. It's attached to his complaint, right? Well, it is attached to his complaint, but the problem with this is, if you look at the four-point restraints, his allegations are that he was in a permanent stress position for two weeks. We know that's not true from his complaint, because Vaughtner met with him, and this is documented in the complaint, Vaughtner met with him face-to-face. She offered — it was her understanding from the director of nursing that Riddick had been offered opportunities for a range of motion, but Riddick refused those opportunities. She advised Riddick that he had access to the outside via the ward porch. She told him that CSH had — Central State had arranged a protocol that would allow Riddick to exercise, and that she understood that to have been implemented by the time Riddick would have received her letter. And so I don't think, when we're talking about plausibility, that he's crossed that threshold when the evidence that he's put into the record belies his own allegations. So that's — so you would have us affirm on the ground that these are just not plausible allegations? I would, Your Honor. That and the presumptively valid nature of a professional judgment in this case. I mean, is it your position — again, I just want to make sure I understand the position — is that it doesn't raise an inference that we've gone outside professional judgment if, for a minute, we credit the allegation that he's in that by itself would not raise an inference that you're beyond professional judgment now? I don't think so by itself. If he said, I'm in these conditions for 19 months, and there's no clinical basis for that me being here, or I have been here, and, you know, the conditions are such that — You don't think that's sort of implicit in the allegations of the complaint, that 19 months was too long? Well, he doesn't — no court has said 19 months is too long. It's a discretionary decision. And Judge Wilkins, in his dissent in Doe — Dissent? I'm sorry? He said dissent. In his dissent in Doe, echoed what the Supreme Court's concerns were in Youngberg. Courts should not substitute their judgment for what is adequate or inadequate. And I would also say this. The cases that we have in the Fourth Circuit and around the country, they deal with inadequate medical care or denial of medical care. They don't deal with the use of seclusion and restraint specifically. The one case cited was a Seventh Circuit case by the plaintiffs where there was seclusion for 60-some days. There was a fact dispute about whether or not that was for clinical purposes versus purposes of protecting the safety of the committed patient and others. Mr. Fisher, you said he didn't allege that there was any — that there wasn't any medical reason for his being — or clinical reason for being secluded for 19 months. We don't need it here because your client says it was for — that he might become violent. And it seems to me that's sort of — I would call it preemptive punishment because it's for future conduct, perhaps, of bad behavior. So we're going to punish you now, and you really shouldn't be for purposes of punishment anyway, but you're going to punish him now for something that he might do later. It says nothing about medical reason or clinical at all. I mean, so he doesn't have to provide it. Your defense has provided it for him. That's the only reason they gave. And you, the way you started your argument probably tells why they did that. You gave us — it's all factual, but you started with what he had done, his criminal conduct, and made sure we knew that. And then you say, but he was found not guilty by reason of insanity. Is that reason that — if that's the reason because of his conduct, then they could say, well, we think you might become bad behavior for the rest of your life, right? If that being the only justification, and as you laid out what he had done, his conduct, couldn't they do that based on that? No, they couldn't do that just because — Why not? What were — 19 months didn't restrain them? He was not restrained. He was in seclusion for 19 months. Seclusion, I mean, yeah. That's what I'm talking about. Well, I — Or he could be in seclusion for the rest of his life, right? I understand the concerns at the pleading stage, I do. And these are allegations. But you don't understand the concerns because you're telling us we should, at this point, dismiss the case under a Twomley-type standard. It's not plausible, you know, right? I am. I'm saying it's not plausible in conjunction with the presumption created by Youngberg that judgments of professionals are presumptively valid, and there are no allegations in the complaint that say, again, he doesn't allege that they had no basis for restraining him, that he doesn't allege that they had no basis for using the seclusion, that he does not allege that there's no basis for the exemption that was sought. So the inference there is that there were reasons for those things occurring, and then his own allegations belie the idea that he was in a stressed position for two weeks straight. I don't think that happened. And I think on a summary judgment record, of course — You don't think that happened? We'll be able to prove that. But you said — excuse me. You said you don't think that it happened? What's that? What you just said. You said, I don't think that happened. Stressed position for two weeks? Yeah, I don't think that happened. And I think from the allegations and the — Why don't you — why don't — why you don't think that? Because — Yeah, we appreciate your opinion, but — Well, we know from — Do we judge that on your opinion about that? No, and, Your Honor, that's why I referred to the February 2, 2018, letter from Dr. Valder in which she says he's being given opportunities for exercise. You want to have it both ways. You want to have what you put in and have the best reading on your side. But then you said we can't look at the only reason for his seclusion was because what he might do in the future. It doesn't seem to be inconsistent. I don't think that's what the record shows. I'm saying what you're arguing to us. I don't think that's what I'm arguing to you. Okay. Very well. Go ahead. Counsel, can I ask you a question about, I guess, about the appointment of counsel? To the extent you think that we — it's not kind of fairly implicit in this complaint and its allegations and the attached documents that the plaintiff is alleging there was not a basis for his treatment. That really does seem like maybe someone should have given him a lawyer if you think it was necessary to include, I guess, the phrase, and this treatment was not justified in the complaint. Doesn't that sort of call into question the repeated requests for the assistance of counsel that were denied? How do you approach that? I think it's in the district court's discretion. The district court reviewed the record. He'd been given multiple opportunities to amend the complaint and, in fact, did so. And he made filings, typewritten. He used legal research. He had a notary help him out. There's affidavits. And so I think he's acquitted himself pretty well in this case. Look, I think the district court did not abuse its discretion in that regard, and I'll just leave it at that. Before you leave it, I did — as I read your brief, you cited the cases about how at the pleading stage counsel is less important than at discovery and summary judgment when counsel becomes more important. So I sort of read your brief to be saying there was no abuse of discretion going back, but that if this case were remanded, that might be a different question, given that the cases you're citing talk about the distinction between the pleading stage and discovery and summary judgment. I don't disagree with that, and I think it's within the court's discretion one way or the other. Thank you. If there are no other further questions, I would just reiterate that we think that the plausibility standard's not been met in this case. We think the presumption of the professional validity is not overcome. There should not be a per se rule that you can't assert that at the 12B6 stage. And we briefed the qualified immunity issue. Again, all the cases that we've discussed today are denial of care or inadequate care. There's nothing dealing with seclusion and restraint, much less getting and obtaining an exemption for the use of seclusion and restraint. So I thank you for your time. If you have any other questions, I'm happy to answer them. Thank you, Mr. Fisher. Thank you. Mr. Britton, you have a few minutes reserved. Two legal points and then a quick factual one, if I may. So on the proper legal standard, we agree with the government just to be clear that the legal standard is less than shocks the conscience here. Opposing counsel just conceded to you that Mr. Riddick didn't need to plead the medical standard, and that is basically open and shut with this case. Additionally, opposing counsel mentioned that he didn't mention that this was — that he didn't deserve to be put in restraints or treated like this. Mr. Riddick, on Joint Appendix 86, paragraph 13 and 14, says things like, During this period of extreme isolation, plaintiff experienced gross hallucinations, plaintiff talked to himself a lot, and experienced long periods of depression where plaintiff stopped eating. If a plaintiff has to tell you that that is not allowed, that he didn't deserve to be treated that way in order to state a claim, then we have raised the Twombly and Iqbal standard incredibly high when it is very low for pro se civil rights complainants. Secondly, I want to return to Judge Gregory's question about punishment. Page 13 of the United States' brief highlights how in the pretrial context, we — the Eighth Amendment requires that individuals not be punished. That is just as true in the Fourteenth Amendment. In fact, it's more true for individuals who have not been convicted. And the timeline here smacks of punishment. Mr. Riddick highlights that on Joint Appendix 13, that two weeks after an altercation, he was placed in restraints rather than the individual that came at him. And then again, two weeks — or the day he complained about his 16-week restraints, he was then moved into seclusion. That undermines the idea that because he was dangerous, that Votter claims, that is why he was being left in seclusion for 19 months. Another quick factual correction that I want to make, opposing counsel Votter and Barber point to the letters that Mr. Riddick handwrote, his complaint, et cetera. But as the State surely knows, the restraints that is used at the hospital bind an individual's hands in front of them like this. And so, of course, Mr. Riddick could handwrite his complaint, but he couldn't even touch his nose. And then additionally, on the point about the notary, Mr. Riddick alleges that there was a two-way mirror on the other side. And a notary has to see you. You don't have to see the notary. So that doesn't undermine Mr. Riddick's factual allegations at all. If there are no further questions from the Court, thank you. Thank you, Mr. Britt. Mr. Kansky, thank you so much. We note that you're a court opponent. And on behalf of the Fourth Circuit, we thank you and your team of lawyers here, the court students, for doing that. And, Mr. Britt, and all of you, the Blue Devils acquitted themselves very well today. And I want to say, if you would stand up for a second. Mr. Britt, stand up. All of you can stand, but Mr. Britt, I want to stand up particularly. Mr. Britt, I want to personally congratulate you, because I understand that today you will be getting your law degree from Duke this afternoon, and I wish you well in your career. Thank you so much, and wonderful. Congratulations. Thank you, Judge. Thank you. Thank you, Counsel. And we'll proceed. And, of course, the other counsel for able representation, and I want to note to Mr. Bakker, thank you for the court as amicus curia. It's always good to have a friend. Okay, we'll come to our Greek counsel and proceed to our next case.
judges: Roger L. Gregory, Pamela A. Harris, David A. Faber